### MOLLIE COLSTON *et al.*
#### *v.*
### ELIZABETH J. OLROYD *et al.*

*Opinion filed October 26, 1903.*

1. APPEALS AND ERRORS—*findings of chancellor will stand, on appeal, unless clearly erroneous.* The findings of the chancellor upon the questions of mental condition of the grantor and undue influence by the grantee, in a proceeding by heirs to set aside a deed, will not be disturbed, on appeal, unless clearly against evidence.

2. WITNESSES—*when grantee is a competent witness.* The grantee of a deed sought to be set aside by heirs of the grantor is a competent witness to testify to conversations which the opposite parties have testified to as having been held with her.

WRIT OF ERROR to the Circuit Court of Cass county; the Hon. HARRY HIGBEE, Judge, presiding.

JOHN A. BELLATTI, A. HEDRICK, and JEFFERSON ORR, for plaintiffs in error.

R. W. MILLS, for defendants in error.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is a bill in chancery filed by plaintiffs in error, Mollie Colston, Abigail Berry, William Wight, John C. Wight, Amos Wight, Jesse Blimling, Maie Blimling, Abbie Blimling, John Blimling and Garnet Blimling, the last five being minors, who sue by their father and next friend, Jacob Blimling, heirs-at-law of Jesse Wight, for the purpose of setting aside certain deeds made by said Jesse Wight to his daughter, Elizabeth J. Olroyd, *nee* Wight, who, together with her husband, Henry Olroyd, are the defendants in error, (Elizabeth J. Wight having been married in December after the making of the last deed in question,) and for the purpose of partitioning the lands in question, together with other lands left by the deceased undivided. The bill sets up the fact that on or about January 2, 1901, Jesse Wight died testate, leaving no widow, but leaving surviving him his children and grandchildren as named in complainants' bill, his only heirs-at-law; that prior to his death, on March 7, 1898, he made and published his last will and testament, and among other bequests gave Elizabeth J. Olroyd $300 in money and all the household goods, and then bequeathed all the residue of his property, both real and personal, to his seven children, share and share alike. The bill further sets up the fact that Sarah J. Blimling, one of the daughters of the testator, died prior to the death of her father, leaving the above named minor heirs; that the testator had sufficient personal property to pay all debts and special legacies, and at the time of his death was seized in fee simple of the following described real estate, to-wit: the west half of the north-east quarter of section 26, township 17, north, range 10, west of the third principal meridian, and the east half of the north-west quarter of said section 26, except sixty-five acres off of the north end, all situated in Cass county, Illinois, and that their interests are each a one-seventh part, except the grandchildren, whose in-

terests are one thirty-fifth part. The bill further sets up
the fact that Elizabeth J. Olroyd had two deeds purport-
ing to have been executed by said Jesse Wight, one be-
ing of the date of November 15, 1899, for the fifteen acres
above described, reciting as the consideration love and
affection for his daughter and one dollar in hand paid,
and the other deed being of date October 25, 1900, pur-
porting to convey all of the south-west quarter of the
north-west quarter of said above described tract, and
reciting as the consideration love and affection and ser-
vices rendered, and conveys and warrants, etc., being
the regular statutory form of a warranty deed; that at
the time the deeds were purported to have been executed
by Jesse Wight he was of unsound mind and memory, and
that his mind was so impaired by old age and illness as
to render him wholly incapable of understanding what
he was doing and wholly incapable of executing deeds;
that the grantee, Elizabeth J. Olroyd, exerted an undue
influence and induced the said Jesse Wight to execute
the deeds, and that said deeds are a cloud upon the title
to the property described herein. The bill asks that the
deeds be declared null and void and set aside, and that
partition be made according to the rights and interests
of the parties.

Elizabeth J. Olroyd and Henry Olroyd, the defend-
ants, answered, denying that Jesse Wight died seized
of the last two mentioned tracts of land, but admitting
that he died seized of the north-west quarter of the north-
east quarter of said section 26, and further saying that
Jesse Wight, in his lifetime, conveyed to Elizabeth J.
Olroyd the south-west quarter of the north-east quarter,
and fifteen acres off of the south end of the east half of
said above described north-west quarter of section 26,
and that at the time he made the conveyances he was
of sound mind and memory and made the conveyances
for a good consideration, and denying that they were ob-
tained by fraud, undue influence or other unfair means.

At the hearing of the case, which was partly on evidence taken before a special master and partly on oral evidence taken in open court, the chancellor found against the allegation in complainant's bill in reference to the deeds made to Elizabeth J. Olroyd, and found that the equities as to those deeds were with the defendants, and decreed that in so far as the bill prayed that the deeds in question be set aside and annulled the prayer be denied, and granted partition as to the balance of the premises.

Several errors are assigned of record by plaintiffs in error, but only two are relied upon or argued, they being (1) as to the condition of Jesse Wight's mind on October 25, 1900, the date of the last deed in question; and (2) that the deeds were obtained under restraint and undue influence brought about by the defendant Elizabeth J. Olroyd and her husband, Henry Olroyd.

The evidence showed that the testator, Jesse Wight, was seventy-two years old and for more than two years prior to his death had been afflicted with cancer of the face; that he was debilitated and weak, and that on October 16, 1900, he fell, while going out of doors, and suffered a stroke of paralysis, resulting in partial paralysis of the lower extremities. It further shows that his daughter Elizabeth J. Olroyd had some twelve or fifteen years before his death been married, but that her marriage relation was such that after attempting to live with her husband for two or three years they finally separated and the daughter returned to the home of her father with a small child, and, for at least ten years, continuously made her home at her father's house; that in 1892 her mother, the wife of the testator, died, and that he never re-married; that the child of Elizabeth died several years before the testator; that the daughter Elizabeth J. from the death of her mother took charge of the household and conducted the same from that time to the death of the testator; that she had three sisters and three broth-

ers, all of whom were married some time prior to the death of the testator and most of whom had left home before the death of the mother, the only member of the family, besides Elizabeth J., remaining at home for any length of time being a son, William, who was the youngest of the boys. The evidence also establishes that the testator was, in his lifetime, a man of good business capacity and had acquired considerable property, and had assisted all of his children except two daughters who were married and living away from home, and the daughter Elizabeth J.; that he had paid considerable sums in security debts for his sons, and that he had for some reason conceived the idea that one of his sons was angered at him and was disposed to treat him harshly, and frequently expressed fear of personal injury from him. One of the daughters, Mrs. Blimling, died some years previous to the death of the testator, and left, among others, a daughter Maie, who was a small young girl and made her home with the testator for several years prior to and up to the time of his death. The evidence also discloses that the cancer with which the testator was afflicted was of such a character that he suffered, at times, intense pain from it, and that there was frequent and excessive flow of blood from it, requiring much attention in the way of wiping and keeping his face and clothing freed therefrom. The family physician who attended him testified that the form of cancer he had was highly contagious in its character, and the evidence discloses that his daughters other than the daughter Elizabeth J. were unable, from the distressing and sickening condition of the testator's face at the times when he was suffering most, to render him the assistance necessary; that the defendant in error Elizabeth J., from the death of the mother to the death of the testator, both before and after his sufferings and afflictions came upon him, was constant and tender in her attentions to him, and when his disease took the form that caused others to shrink from him

she remained his main reliance. It also appears from the evidence that prior to the death of the mother, and shortly after the daughter Elizabeth J. returned home and resumed the home relation, the testator deeded her twelve and one-half acres of timber land, and in 1898, about the time he began to be afflicted with the cancer, he deeded to her the fifteen acres of land above mentioned. These conveyances were promptly put of record, and the other children of the testator became apprised of them, and conceived the idea that it was likely or probable that the testator would make other and further conveyances or gifts to defendant in error Elizabeth J., and there is much in the evidence tending strongly to show that the other children, by concert of action in making the charge that the mind of the testator was being affected, determined to defeat any such further or other conveyance, and that the testator was fully advised and informed of the conduct and determination of his other children.

The record is voluminous and the evidence contradictory. Except the defendant in error Elizabeth J., all the living children of the testator, and the grandchild, Maie Blimling, and the husbands of the married daughters and wives of the married sons, testified that in their judgment the testator was of unsound mind for periods varying from six or seven months to a year or two before his death. In addition to these members of the family expressing this opinion were three other witnesses who were not in any way related to the testator, so far as the record shows, nor in any way interested in the subject of litigation, who stated that, in their opinion, for some period before his death the testator was not of sufficiently sound mind to transact ordinary business; while on the part of defendants in error ten witnesses, aside from defendants in error, and who were in no way related to the parties and had no interest in the result of the suit, including the family physician, who had

known the testator for thirty years and been the family physician for the last fourteen years of the testator's life and treated him in his last illness, and the others being neighbors and friends who were intimately associated with him, testified that he was of sound mind clear up to the time of his death, except in irrational delirium resulting from fever.

From a review of the entire testimony we are satisfied that the evidence utterly fails to show any general affection of the mind of the testator, and that it also fails to show that there was at any time any undue influence exercised by the defendant in error Elizabeth J. Olroyd to induce the making of the deeds sought to be set aside. There is not a word of evidence in the record showing that she at any time or under any condition solicited, urged, influenced or induced the testator to convey to her any property. Her husband, Henry Olroyd, was employed by the plaintiff in error William Wight to stay at the house and assist in taking care of the testator shortly after this stroke of paralysis and four or five days before the making of the deed to the forty-acre tract. At that time it is shown that he was wholly unacquainted with his present wife; that there never had been any association between them, and there was not the slightest evidence to show that until long after the deed in question was made he had any interest in her welfare or in the procurement of any conveyance to her. The deed to the forty-acre tract was made on the 25th day of October and six days after the paralytic stroke, and the real controversy in this case, and the only one that there is a semblance of substantial testimony to support, is the condition of the mind of the testator on the day of making that deed. In reference to his condition upon that day the evidence is absolutely irreconcilable. It was simply a question of fact, supported upon one side by those interested in defeating the conveyance, and upon the other side by the doctor who was in attend-

ance, by the notary who took the acknowledgment, and by the defendants in error. Those attacking the deed state that on that day the testator was in a stupor and was irrational, and if their testimony is to be taken as true it is very doubtful if the deed should be sustained; while on the other hand the witnesses for defendants in error state that he was entirely rational, talked understandingly, discussed politics, the weather, and talked about the business in hand with as much clearness as he had ever discussed any business or general matter.

At the time this deed was made the attending physician brought the notary out to the residence of the testator to take the acknowledgment, which was done pursuant to previous arrangement between him and the testator, who had instructed him to have the deed made and to bring a party to have it acknowledged. It was acknowledged before Mr. Edward Clifford, a notary public, then reading law with Mr. R. W. Mills and afterwards a partner with Mr. Mills in the practice of law, and he and the doctor both testified that they had been apprised of the determination of the other children to prevent any further conveyance being made to the defendant in error Elizabeth J., and that to that end the other children of the testator, and those interested in defeating it, had all been circulating the report that the testator's mind was affected, and that upon the occasion of the execution and acknowledgment of the deed they made a special effort and gave especial attention to the mental condition of the testator in anticipation of the trouble that followed. Much of this evidence was heard before the chancellor in person, who came to the conclusion that the truth of the matter lay with the defendants in error, and we are satisfied with his conclusion.

As showing the animus in this case, the evidence discloses that some of the children having ascertained that these deeds were made, refused to visit the testator during his last illness, and that on Christmas, in anticipa-

tion of the gathering of the family, an elaborate dinner was prepared and none of them came to partake of it; that on the 29th day of December, being three days before the death of the testator, and at his solicitation, the children all met at his house, and there such proceedings were had, in an effort to have defendant in error Elizabeth J. re-convey this property, as showed an utter want of feeling on the part of his children for the dying father. To enter into the details of that scene would be a reproach to the living and the dead and of no benefit to anybody. In this was shown sufficient to justify a chancellor in feeling that there are people who, when in the grasp of greed and selfishness, will go to almost any length to acquire property. It is not surprising if the confidence of the court in the testimony of these plaintiffs in error was shaken by that transaction.

It is complained that defendant in error Elizabeth J. Olroyd was not a competent witness, and when she was offered as a witness a general objection to her competency was interposed. Plaintiffs in error had testified to a number of conversations with her, and among them the scene of the 29th of December, of which we have just spoken. She was a competent witness as to all the conversations to which they testified. After the general objection to her competency no other objection was interposed at any time to her testimony. She was allowed, without objection except the general objection, to testify to matters as to which she was not competent, but it was the duty of the chancellor,—and we presume he performed that duty,—to only consider the competent evidence. There was no reversible error committed by the chancellor.

We think the decree of the circuit court should be, and it is, affirmed.                    *Decree affirmed.*